James Gibsoh, J.
This action was tried in Albany County under stipulation of the parties and their attorneys pursuant to CPLR, 4013. The case was finally submitted (CPLR 4213, subd. [c]) on October 9, 1973 with the filing of defendant Syndicate’s rebuttal brief.
The subject of the litigation is an artificial body of water known as the Beaver Dam Reservoir in Sullivan County and Orange County. The primary issue is whether certain rights in the reservoir were appurtenant to a canal operated by the original owner of those rights, so as to be extinguished upon the abandonment of the canal; or whether they were, rather, in the nature of a profit or an easement in gross, thus surviving the abandonment of the canal and being susceptible of conveyance to a third party.
The plaintiff Passaic Valley Council, Boy Scouts of America, formerly Alhtaha Council, Boy Scouts of America (Council) and the defendants Hartwood Syndicate, Inc. (Syndicate), and The Hartwood Club (Club) assert conflicting rights to the use and enjoyment of the waters of the reservoir. The Council seeks judgment declaratory of its rights and enjoining defendants from interfering with the reservoir dam and the impounded waters. The Syndicate and the Club, separately defending, interpose denials, defenses and counterclaims, and demand judgment declaring their respective rights and granting appropriate injunctive relief.
I
THE ISSUES
The Council is the owner of the fee, as conveyed by deeds of July 16, 1855 to Osmer B. Wheeler, by the president, managers and company of the Delaware and Hudson Canal Company (Canal Company). The Syndicate’s and the Club’s claims to rights in the reservoir derive from the Canal Company’s reservation in each of the two 1855 deeds of the rights, among others, to occupy so much of the land as the grantor Canal Company might consider necessary for a reservoir and to construct a dam for reservoir purposes. The Council contends, however, that the rights were appurtenant to the Canal Company’s canal and were extinguished when the canal operation was terminated in 1898; but the Syndicate and the Club assert that the reservoir rights were not easements appurtenant to the canal but *1021 constituted a separately alienable profit a prendre or, alternatively, an easement in gross, which survived the abandonment of the canal and was, in fact, conveyed by the Canal Company to the Club by 1903 quitclaim and thereafter, by the Club’s successors in title, to the Syndicate. The issues thus outlined are the primary ones. Involved, also, are certain hunting, fishing and boating rights claimed by the Club. Other questions, including the parties’ several claims of prescriptive rights, are presented and will be discussed in due course.
II
THE APPLICABLE PKIÍTCIPLES OP LAW
The relevant principles of law may be synopsized at this point and to the extent necessary will later be discussed in somewhat greater detail.
A profit a prendre has been defined as a right exercised by one person in the soil of another, including the right to take a part of the soil or produce of the land. Examples are the right to take timber, gravel, coal or minerals generally, from the land of another; but it has been said that flowing water ‘£ is not considered a product of the soil [and] a right to take such water is not a right of profit a prendre, but rather is an easement ’ ’ (25 Am. Jur. 2d, Easements and Licenses, § 4, pp. 419, 420-421; 17 N. Y. Jur., Easements and Licenses, § 4).[1] It is stated, too, that1 ‘ a distinction between an easement and a profit a prendre is that the former generally implies the existence of a dominant and a servient estate while the latter may exist without both estates ’ ’; but the profit £ £ is nevertheless in the nature of an easement, and although capable of being transferred in gross, may also be attached to land as an appurtenance and pass as such ’ ’; and ‘ ‘ it is doubtful whether it can be severed from the estate to which it is attached or be granted alone ” (17 N. Y. Jur., Easements and Licenses, § 4, pp. 256-257). It is said that easements in gross are those ‘ ‘ which are not appurtenant to any land, and which the owner may enjoy, although he does not own or possess a dominant estate, or any land whatever ” and that Such a right or easement is for the personal benefit of the grantee and is not incident of or concerned with a dominant estate; it exists where there is only a servient estate, and the privilege given to the grantee attaches to the person and not to any land ” (op. cit., § 8, p. 260).
*1022 A case has been made for elimination of the term “ profits ” as redundant, so that in matters such as this the distinction would be as between two forms of easement, i.e., easements appurtenant and easements in gross (Restatement, Property, § 450, Special Note, pp. 2901-2092). The apposite definitions are these: ‘‘ An easement is appurtenant to land when the easement is created to benefit and does benefit the possessor of the land in his use of the land ” (op. cit., § 453); while “ An easement is in gross when it is not created to benefit or when it does not benefit the possessor of any tract of land in his use of it as such possessor ” (op. cit., § 454). An easement may be in gross either because it is not connected with the use of any particular land, or because, even if it is, it was not intended to be appurtenant to such land (op. cit., § 454, comment a., pp. 2917-2918).
Important to the decision of this case are the principles that: ‘ ‘ Easements in gross are not favored by the courts, however, and an easement will never be presumed as personal when it may fairly be construed as appurtenant to some other estate. If doubt exists as to its real nature, an easement is presumed to be appurtenant, and not in gross.” (25 Am. Jur. 2d, Easements and Licenses, § 13, p. 427; Wilson v. Ford, 209 N. Y. 186, 196, mot. for rearg. den. 209 N. Y. 565, and authorities there cited.) In the light of these general principles, the background facts may now be considered.
Ill
THE FACTS
The problem posed involves an interesting chapter in the history of transportation — that concerning the construction and subsequent enlargement of a canal designed to transport coal from the mines of Pennsylvania to the City of New York. Construction commenced in 1823 and the canal was completed in 1828. The route extended from Honesdale, Pennsylvania, easterly and northeasterly to Kingston, New York, whence the canal boats continued in the Hudson River to New York City. In the second quarter of the 19th century the volume of business so greatly increased — and, indeed, the canal carried the bulk of New York City’s coal until after the Civil War — that the Canal Company enlarged the facility substantially. In the process, the Beaver Dam Reservoir involved in this litigation was constructed to feed water to the enlarged canal. The reservoir dam was erected across a small brook which became the outlet of the reservoir, emptying into Bushkill Creek and flow *1023 ing thence into the Never sink River, which crossed the Canal Company’s property at the site of the canal. Thus, the water, when released from the reservoir, flowed downstream about six miles to the point where it was diverted from the Never sink River by the Never sink Dam and was fed into the summit level of the canal — a stretch some 17 miles long — whence it could be controlled so as to flow down the various levels of the canal, either to Kingston on the north or to Port Jervis on the south.
As time passed, the once flourishing canal business diminished in the face of railroad competition, to which it finally succumbed, and the canal itself closed in 1898.
As hereinbefore indicated, the deeds constituting the genesis of the problem now presented were given in 1855 by the Canal Company to Wheeler. The lands conveyed aggregated 1,186 acres. At that time, the reservoir in question had been constructed and the water was being used to feed the canal. The area of the reservoir at that time does not appear, but presently it occupies about 114 acres. The now crucial reservations were as follows: ‘[1] Excepting out of the premises aforesaid and
hereby expressly reserving to the said the President, Managers and Company of the Delaware and Hudson Canal Company and their successors and assigns the absolute and unqualified right to occupy so much of the land as they may consider necessary for a reservoir or reservoirs or for any appendages to the same, or for repairing improving, enlarging or maintaining the same, and to construct a dam or dams for said reservoir purposes and to overflow all the lands that they may require for said purposes.”[2]
*1024 Quite clearly, this language imports, in essence, no more than the right to occupy land for a reservoir, to construct a dam for such reservoir purposes, and to overflow all lands required for those purposes. The language is broad, as defendants contend, but it is, at the same time, vague and nonspecific. Nevertheless, defendants contend that it clearly defines a profit or, alternatively, an easement in gross; and, indeed, that the language is so definite and certain as to require no interpretation nor any consideration of the surrounding circumstances. Thus, defendants urge, the great mass of documentary and other proof bearing upon the parties ’ situation, the chain of title and the circumstances surrounding the transfer was improperly received and should now be stricken from the record.
Of course, the right to impound water is inferable — although neither word is used — -but, beyond that, there is no language from which any intended and collateral use or uses of the water so impounded may be inferred. Ordinarily, there would be implicit, in a naked provision for a right of impoundment, the right to use the surface of the pond for such obvious purposes as swimming, boating and fishing and for any incidental aesthetic enjoyment as well. Other uses, within the confines of the Wheeler tract or beyond them, may well have been contemplated but the expressed “ right to occupy * * * land * * '* for a reservoir ’ ’ is barren of meaning if recourse to the surrounding circumstances be denied. Nevertheless, defendants’ theory of the case would exclude proof of the use to which the reservoir was being put at the time the deed was given and would even interdict consideration of the fact that the beneficiary of the reservation was incorporated to engage in the canal business — as witness the Syndicate’s objection to the receipt in evidence of the statute whereby the Canal Company was created. The words of the reservation do not, for example, either explicitly or impliedly suggest the right to divert water to other lands and there — as in the Loch Sheldrake case (306 N. Y. 297), upon which defendants greatly rely — to waste and consume it; but at least some of such factors as severance, removal and consumption of the products of the land seem to underlie the concept of a profit. No right in the nature of a profit is inferable from the reservation; and the presumption is that an appurtenant easement was intended. As was said in Wilson v. Ford (209 N. Y. 186, 196, supra): “ It is a well-established principle of law that an easement in gross will not be presumed where it can fairly be construed to be appurtenant to land [and the conveyance] must be construed as to give effect to the intent of *1025 the parties manifested by the language used, subject to the further rule that when the language used is susceptible of more than one interpretation the courts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject-matter of the instrument.” (And, see, 25 Am. Jur. 2d, Easements and Licenses, § 13, p. 427.)
Thus it is necessary to look to the circumstances surrounding the 1855 deeds to determine the nature of the reservation. Put somewhat differently, resort to extrinsic proof must be had to resolve ambiguity in the language of the reservation itself, particularly when read in the light of the presumption — an ambiguity which arises, not from language that is obscure or uncertain per se, but from the omission of language indicating the reach of the otherwise naked right to occupy land for a reservoir.
It becomes necessary, then, to turn first to the title history, giving consideration to that upon which defendant Syndicate’s claims are predicated, and, following that, to the chain of title and other relevant facts bearing upon the hunting, boating and fishing rights claimed by defendant Club.
By deed of August 2, 1969, Vincent C. Galligan and others, the successors in title to Osmer B. Wheeler, conveyed to the Council[3] the 1,186 acres acquired by Wheeler in 1855 (as well as the so-called Van Etten lot of 106 acres which had come into the chain of title from another source), with various exceptions not pertinent to the legal issue now under consideration, Intermediate the 1855 deeds to Wheeler and the 1969 deed to the Council, the canal operation was, in 1898, permanently discontinued, as authorized, after the event, by the Legislature, by act providing, among other things: “ § 3. Whenever it shall appear to the managers of said canal company that it is able to fulfill the aforesaid purpose of opening and of mining and bringing to market a supply of stone coal which is found in the interior of the state of Pennsylvania more economically by rail over its own or other lines than by its canal, it shall be lawful for said company, and it is hereby authorized and empowered by vote of said managers, to lease, sell or discontinue to use or maintain said canal, or any parts thereof, which in their judgment are no *1026 longer necessary for said purpose.” (L. 1899, ch. 469, § 1, eff. April 28,1899.)[4]
By deed of June 24, 1899, D & H (the Canal Company, under its new name [n. 4]) conveyed to Cornell Steamboat Company, all the grantor’s “ right, title, interest, claim and possession in and to the Delaware and Hudson Canal, including canal bed, locks and their appurtenances, tow path, rights to divert and use water for canal purposes from the Lackawaxen, Never sink and Delaware rivers, Rondout Creek and the small streams near Ellenville so long as said canal shall be maintained as such, easements, aqueducts and bridges beginning at the tide lock at Eddyville in the Town of Ulster, County of Ulster, State of New York and ending at the guard lock upon the easterly bank of the Lackawaxen river at Honesdale in the County of Wayne, State of Pennsylvania ”.
Despite the discontinuance of the canal in 1898 and despite the 1899 conveyance to Cornell Steamboat Company of the canal properties, the D & H on June 17, 1903 quitclaimed to defendant Club the reservoir rights reserved by the 1855 deeds tó Wheeler; and, after certain intermediate deeds, the rights were purportedly conveyed by Townley and others to defendant Syndicate, by deed of January 1,1932. This deed is the basis of the Syndicate’s claim of record legal title.
The reservoir or pond is bisected by the Council’s and the defendants’ line, which is also the Sullivan County-Orange County line. Concededly, the Council owns the fee of the réservoir bed north of the line as well as the site of the dam and the outlet. The Club’s ownership of the fee of the reservoir bed south of ijhe line is also conceded.[5]
Asserting that the rights reserved by the 1855 deeds constituted easements appurtenant to the canal lands, the Council contends that the easements were extinguished when the canal operation was discontinued in 1898 and never revived; and thus, of course, that the Canal Company, by then the Delaware and Hud *1027 son Company, possessed nothing to convey to the Club in 1903 [6] and that the prior (1899) deed to the Cornell Steamboat Company[7] was likewise ineffective.
IV
THE LOCH SHELDRAKE PRECEDENT
The defendants rely very strongly on Loch Sheldrake Assoc. v. Evans (306 N. Y. 297). In that case the issue was the meaning of the reservation contained in a 1919 deed from Divine to Greenspan, the deed itself conveying a natural lake known as Loch Sheldrake and all the lake shores. As appears at page 301 of the court’s opinion, the grantors reserved, among other things, “ the right and privilege of damming the Sheldrake Lake or Pond and the outlet thereof, and of impounding the waters of said Lake or Pond and raising and drawing the same ’ ’ and the deed provided that “ Such waters, however, shall not be drawn lower than the natural low water mark of the said Lake or Pond, and they shall not be raised higher than the normal or natural high water mark of said Pond, except * * * in case of unusual or extraordinary flood ”. In 1927, the Divines conveyed the reserved rights, together with a mill lot some distance south of Loch Sheldrake, to defendant Evans’ predecessors in title. From 1915 on, Mrs. Evans and her predecessors had operated a large hotel on other lands owned by them at some distance from both Loch Sheldrake and the mill lot. From a time long before any of the deeds in question in the case, water had been impounded by the Divines by a dam in an outlet of Loch Sheldrake and conveyed through a pipe to the Divines’ mill on the mill lot, and some of that water, after being conveyed to, used at and discharged from the mill, was sold to the hotel owners for consumption for hotel purposes and taken by them from the flow of the mill tailrace, and, after discontinuance of the mill, from an extension to the hotel property of the original piping.. The Court of Appeals, rejecting plaintiff’s claim that the water rights reservation constituted an easement appurtenant to the mill lot and permitted the use of the water *1028 for the uses of the subsequently discontinued mill only, held, instead, that a profit had been created; and the court expressly sustained defendant’s contention that she was “ ‘ entitled to the sole, absolute and free use of the waters of Loch Sheldrake between the low and high water marks for the benefit of her business and business properties ’ ” (p. 302). The position of the defendants in the case at bar derives no support from Loch Sheldrake. There the court found a profit, within the definition of profit that the court (p. 304) reiterated, that is, “ an absolute right to take profit or produce from the land conveyed ”. Present were the factors of[1]' severance of the product — for the court obviously equated water and produce[8] — its removal from the premises and its waste or consumption at another site; comparable perhaps to the removal of water for bottling and sale (see Saratoga State Waters Corp. v. Pratt, 227 N. Y. 429, cited in Loch Sheldrake [p. 304]); or to the removal of water in the form of ice, which the Court of Appeals seems to have regarded as a technical profit and thus capable of being .transferred in gross, but which, otherwise, under appropriate facts, could be attached to a dominant estate (Huntington v. Asher, 96 N. Y. 604, 610-611). Nothing of that nature appears in the reservation in the case at bar, of the ‘ ‘ right to occupy * * * land * * * for a reservoir ”. Importantly, Loch Sheldrake dealt with a clear and explicit reservation of water and the express right of ‘ ‘ drawing ’ ’ water in definitely fixed quantities (measured by the low and high water marks) —provisions which the court’s opinion stresses. No such specifics are to be found in the Canal Company’s reservation, in which even the right to take water appears only by inference and there is no inkling of the use and purpose contemplated. In short, nothing in Loch Sheldrake contravenes the hereinbefore-stated conclusion that the language of the Canal Company’s reservation is not so clear or explicit as to overcome the presumption favoring an appurtenant easement and thus to deny resort to extrinsic proof. It is worthy of note, perhaps, that although the Loch Sheldrake court found in the language of the reservation no ambiguity — at least with respect to the “precise quantitative limitations ” of the amount of water that might be taken (p. 305) — in other respects the court dealt at considerable length with the past and current uses of the water, with the situation of *1029 the three properties involved and with the surrounding circumstances— all these factors being elements which the defendants in the case at bar would exclude from this record. It may be noted, too, that Loch Sheldrake is helpful as it recognizes, in discussing the reserved right in that case, that “ such a right to take water from a distant source might, by other and appropriate kinds of verbiage, be so granted as to be appurtenant to specific lands separated from the source of supply ’ ’ (p. 304).
V
EXTBINSIC EACTOES AND PBACTICAL CONSTBUCTION
In considering factors extrinsic to the 1855 deeds, it is appropriate to note first of all, as did the Loch Sheldrake court, the then current and past use or uses of the subject of the reservation in issue — in this case the Beaver Dam Reservoir. At the time of the 1855 conveyances, the enlargement of the canal had been completed for some time and the reservoir essential to feed the canal’s increased capacity had been constructed and the reservoir waters were being used for that purpose. It would be absurd to suggest — and of course no one does — that any of the parties was unfamiliar with these uses, apparent to the eye, as they were, and obviously essential to the operation of this celebrated and ingenious enterprise. That the parties would consider and intend that a use so essential to the canal operation be appurtenant to the canal lands is reasonably to be concluded. That there may have been contemplated some use other than canal use is unlikely in light of the provisions of the act whereby the Legislature authorized the incorporation of the Canal Company and generally limited its authority to the construction and maintenance of a canal and the exercise of powers incidental to that authority (L. 1823, ch. 238).
Equally, and perhaps even more compelling, as respects the case for an appurtenant easement, is the practical construction given the reservation by the parties concerned. From and before the time that the reservation was made, the Canal Company used the waters of the reservoir to feed its canal. There is no evidence, and not the slightest indication, that the company ever utilized it for any other purpose. It has been noted (supra, p. 1026) that when the Canal Company finally discontinued the operation, the Legislature, after the event, authorized the company to lease, sell or discontinue the use and maintenance of the canal; and the company thereupon conveyed to Cornell Steamboat Company the “ Delaware & Hudson Canal ”, including the canal bed, water rights, and all appurtenances. That *1030 by the language of the grant (quoted supra, p. 1026), the. grantor intended to, and did, convey its reservoir and other water rights as appurtenances to its canal bed and any other canal realty possessed by it, is too clear to require discussion'; and it is quite reasonable to infer — although not conclusively, perhaps — that the grantor intended to transfer all the rights that it had reserved in its 1855 deeds to Wheeler, clearly treating them as appurtenant easements, and in this fashion giving a persuasive practical construction of its own language as appearing in its 1855 reservations.
Other instances of practical construction appear in the testimony. The defendants’ witness, Judge Dimock, who was 83 years old at the time of the trial, had been familiar with the properties here involved for a period that commenced long before 1920 (in which year he became a member of the Club) and continued until the time of the trial. He had been the secretary and a member of the board of trustees of the Club and the president and a member of the board of directors of the Syndicate, relinquishing certain of these offices after the inception of this litigation. His construction of the intent of the document, as evidenced by the acts of the parties from time to time acting under it, was, most certainly, the product of superior knowledge of the circumstances, and was expressed with full awareness- and appreciation of the legal questions involved. Hence, his views are especially interesting, and particularly so in those instances in which his conclusions run counter to defendants’ interests.
Thus, the witness, on cross-examination, said that the Council had the . right — at least vis-á-vis the Syndicate — to use the waters which flowed the lands owned by the Council, while asserting that the Syndicate nevertheless had the right at its election to drain those same waters from the reservoir. In a long letter of October 21, 1968, the witness told the Council’s predecessor In title, Mr. Galligan, that he, Galligan, had ‘ ‘ the right to boat but not fish on the north half of the pond during such time as the water was not let out by the Syndicate ”; and added that “ Largely on account of your neighborliness, the Hartwood people have been enjoying the Van Etten lot [the dam site] by using it as a camp site and boat mooring[9] and picnic ground and they *1031 are very grateful ”, but that they would be disinclined to purchase Mr. Galligan’s property “ Since the Hartwood people feel that they are getting all the benefit of the Beaver Dam tract and pond without owning them ”. In a letter of January, 20, 1969, addressed to the Council’s principal, after the Council had contracted to purchase the property, Judge Dimock said: “ The exercise of the Galligan rights by the Boy Scouts will interfere very little with the use to which the Hartwood Syndicate and Hartwood Club now put their property. The Galligan rights now include the right to hunt on the Van Etten lot and the right to boat and bathe upon the northern part of our Reservoir whenever the Syndicate fills it with water. These rights interfere very slightly with the Syndicate’s or Club’s exclusive rights to fish on all of our Reservoir, to boat and bathe on the southern part, to hunt on all the surrounding property except the Van Etten lot and to empty and fill our Reservoir.” These statements of Judge Dimock seem of considerably greater significance than this same witness’ testimony as to his recollection of a letter written by Mr. Galligan over 50 years before, and thereafter destroyed, in which, as Judge Dimock recalled it, Mr. Galligan stated that as the Hartwood Club had some rights in the property and the Hartwood Syndicate so-called owned the rights of the Delaware & Hudson Canal Company, he felt some árrangement of advantage to all three parties might be made with respect to ownership and protection, et cetera.” Judge Dimock’s views are not given substantive effect, of course, but they do offer a practical construction at some variance with the legal position now assumed by the Syndicate.
To summarize the issue of record legal title, dependent in turn upon the issue of profit or easement in gross vis-a-vis easement appurtenant: The language of the water rights reservation is vague and nonspecific and completely inadequate to define the nature of the rights reserved. The presumption favoring appurtenant easements might well determine the issue; but the same result is reached upon going beyond the presumption and having recourse to proof of the situation of the properties and the parties and the circumstances surrounding them. The conclusion is inescapable that the reservation was of an apartment easement which was extinguished upon the abandonment of the canal in 1898; and, therefore, that the Syndicate possesses no record legal title to any of the rights reserved by the 1855 deeds.
*1032 VI
THE SYNDICATE’S CLAIM OE PRESCRIPTION
As an alternative to its claim of record legal title to the reservoir rights, the Syndicate claims title by prescription, its brief asserting “ actual, open, notorious, exclusive, and continuous ” adverse user under claim of right, from the time of the deed of June 13, 1904 which purportedly conveyed to it the reservoir rights reserved by the 1855 deeds. The requisite test is “ that the use be adverse, open and notorious, continuous and uninterrupted for the prescriptive period ” (Di Leo v. Pecksto Holding Corp., 304 N. Y. 505, 512). The Syndicate’s proof falls far short of this mark.
Thus, it must be noted at the outset that the Syndicate’s assertion in its brief that the gatehouse over the spillway had been constructed by it is not supported by the record. There was proof that in 1907 stop planks constituting the bulkhead were removed by unidentified persons, following forcible entry of the locked gatehouse, with the result that the reservoir was emptied. This proof was not relevant to user, of course, but the testimony of a principal of the Syndicate that he replaced the planks three years later did relate to that issue. Under different circumstances, user might perhaps be reflected by the execution in 1925 by the Syndicate to the Orange County Public Service Co. Inc. of a “ lease and grant ” of the right, for one year, “ to insert planks in the dam at the Beaver Dam Pond and to raise the water in said Beaver Dam Pond and to store the waters therein, with the right and privilege of second party withdrawing the water from said Beaver Dam Pond at such time or times as it may desire so to do during said term ”; but, as the Syndicate’s brief correctly states, no witness testified to the utility company’s actual use during the one-year term or during the additional one-year term for which the agreement was extended. There is claimed to be an inference that the utility company left the reservoir empty and it is said to have remained empty until 1929 when representatives of the Club or of the Syndicate replaced the stop planks. There is testimony that during the period 1929-1958 the reservoir was more than half full but no significant inference arises from that fact, absent any indication that the Syndicate did in fact exercise some rights and in fact regulate or control the Waters, by action hostile to the fee owners. In 1958, the Syndicate licensed the Club, to which it was closely related, to exercise the Syndicate’s alleged “ flow-age rights ”, and some work on the reservoir followed; but again *1033 the record fails to indicate how extensive or substantial it was, nor does it identify the person or entity performing it. The other indicia of dominion that the Syndicate asserts are of no greater significance.
Viewed in its entirety, the evidence offered in support of user consists of no more than questionable circumstantial evidence or inference of sporadic and infrequent acts, for the most part of little or no consequence, with periods of years intervening between some of them. Clearly the use was not ‘ ‘ continuous and uninterrupted ’ ’ nor was it necessarily adverse to the fee owners’ rights or hostile to the uses of the pond — recreational and the like — that some of the owners enjoyed with some regularity, through the years. It is clear that no rights were gained by prescription.
VII
THE club’s EISHIHG AMD OTHER RIGHTS
As has been noted, the Club owns the fee of the bed of the reservoir south of the county line but it also possesses certain rights applicable to the entire reservoir, except the Van Etten lot hereinbefore referred to. These rights were described in certain 1893 and 1895 deeds thereof as ‘ ‘ the perpetual and exclusive right to shoot, hunt and pursue game of all kinds in their respective seasons, to take fish, and to sail and maintain boats upon the waters included in the lands hereinafter described The issue is purely one of construction, the Club asserting that the ‘ ‘ exclusive ’ ’ rights granted are literally that, while the Council, as owner of the bed of the northern portion of the reservoir, contends that the grant did not deprive it of the right to enjoy the same rights, on its own lands, in common with the Club; urging, in other words, that the grant was ‘ ‘ exclusive ’ ’ of all the world except the grantor and the grantee. The Council cites no persuasive authority in support of its position; there is respectable precedent to the contrary (see, e.g., St. Helen Shooting Club v. Mogle, 234 Mich. 60); and no reason appears for denying to the term ‘ ‘ exclusive ’ ’ its ordinary meaning.
The grant does not deprive the Council of any rights in respect of the Van Etten lot nor of bathing and swimming rights elsewhere in the northern portion of the reservoir. There was uncontradicted testimony that the Council’s predecessors regularly boated and fished in the reservoir and the Council points to this as evidence of practical construction supporting its theory; but, . absent any showing of knowledge or acquiescence on the part of the Club, the proof may not reasonably be given that effect; *1034 and there is no claim that any boating and fishing rights, to be enjoyed in common with the Club, were acquired by the Council or its predecessors by prescription (see Spahn v. Stegemann, 120 N. Y. S. 2d 42).
VIII
THE CLUB’S SUBMERGED LANDS
The Club asserts ownership in fee of the lands underlying the southern portion of the reservoir; and in its post-trial memorandum of law requests a determination that the Council, if it succeeds in this litigation, is not entitled to continue to overflow these lands. Although injunctive relief to that effect is not expressly sought by the Club, the determination that it seeks would furnish a predicate therefor. To command the Council to empty the reservoir would be to do away with the boating and fishing rights that the Club so strenuously asserts and defends; removing the water upon which the boats float, exterminating all the fish and other wildlife in a 114-acre body, of water, and thus contriving at least a minor ecological disaster. These lands have apparently been flooded for at least 120 years, continuously except for the relatively brief and minor interruptions hereinbefore noted; and this with the Club’s apparent acquiescence and approval since 1893 or 1895, and certainly in aid of its fishing and boating rights acquired by it in those years. Certainly, the court’s equitable powers will not be exercised, at this extraordinarily belated insistence by the Club, to evoke such Draconian action. It is scarcely necessary to mention the anomaly presented by the suggestion that the Club’s rights be vindicated by destroying the means of exercising them. The result would be to terminate the status quo existing for more than a century with the approval of all concerned and, certainly, for the direct benefit of the Club itself.
Additionally, the finding sought is not within the compass of the action, as delineated by the pleadings and circumscribed by the relevant proof. The real issues, to which all others are subsidiary, are but two: Whether the reserved water rights were easements appurtenant or in gross and whether the Club’s “ exclusive” fishing, boating and like rights exclude the Council, as fee owner, as well as the public generally, from the exercise of similar rights. The action was instituted as against the Syndicate and, as the result of the Syndicate’s motion to dismiss, the Club was brought in; the basis of its interest, as tersely stated in the supplemental complaint, being that “it,has or claims to have some interest in the Beaver Dam Reservoir or *1035 the waters thereof ”. Judgment is demanded (1) declaring the parties’ rights with respect to the reservoir, the dam, the impounded waters and the appurtenances; (2) enjoining the defendants from, among other things, removing the dam and draining the reservoir, as concededly, the Syndicate had threatened to do; and (3) for damages, this demand being no longer asserted. The sole thrust of the Club’s counterclaims is to its fishing and other recreational rights. It seeks injunctive relief only to enjoin the plaintiffs ‘ ‘ from fishing, sailing, and maintaining boats upon the waters of Beaver Dam reservoir ”. Its first counterclaim, interposed under article 15 of the Real Property Actions and Proceedings Law, is directed solely to the same rights, predicated on the allegations that plaintiffs ‘[1] may claim ’ ’ rights adverse to these rights; and its other counterclaim is to enjoin plaintiffs’ invasion of these same exclusive rights. Thus, the action is not to determine legal title or the ownership, as such, of the Club’s lands nor all the attributes of the Club’s supposed fee ownership. With one relatively minor exception, the ownership of the various lands with which this litigation is concerned has been conceded, but that for purposes of this case, and the issue is not legal or marketable title or even ownership qua ownership.
The determination now sought by the Club might properly be the subject of an article 15 Real Property Actions and Proceedings Law action (such as that for which the Club did indeed counterclaim with respect to its fishing and other recreational rights only) or of other appropriate pleading in this action. Had the Club directly posed the issue of its legal title to the bed of the southerly part of the reservoir, whether by an article 15 action or by appropriate pleading, the case would have opened to proof of any defects or deficiencies in its title and also, perhaps, to defenses predicated on the century-old flow-age of its lands. The conclusive determination of title, and of incidents of title relevant to the existing flowage, that would have followed in such case cannot be had in this action in which questions of ownership were very largely conceded, without benefit of title searches or certificates, but only for purposes of this action, and so as to constitute a frame of reference for examination of the issues respecting the nature of the 1855 easements and the exclusivity of the Club’s recreational rights.[10] The determination sought may not be had upon this record.
*1036 IX
MOTIONS
The defendants’ motions to strike out evidence received over objections interposed under the parol evidence rule are denied.. The defendant Syndicate’s motion to be relieved of a stipulation concerning the relationship between two corporate entities is granted.
X
JUDGMENT AWABDED
The foregoing decision indicates the relief to be awarded and that to be denied and the following is intended only for counsel’s guidance and possible assistance.
There should be judgment:
(1) declaring that the rights reserved by the 1855 deeds constituted easements appurtenant to the canal lands and were extinguished upon the abandonment of the canal operations in 1898 or 1899 and that, except as hereinafter indicated with respect to the Club’s hunting, fishing and boating rights, neither defendant possesses any rights, whether by grant, prescription or otherwise, with respect to the dam and its appurtenances or to the reservoir and the waters thereof within the County of Sullivan;
(2) enjoining the defendants from interference with the dam, appurtenances, reservoir and waters;
(3) dismissing the first counterclaim interposed by defendant Syndicate, except as to paragraph A (1) of its demand for judgment, as to which declaratory judgment will be granted as hereinbefore in paragraph (1) indicated;
(4) dismissing the second counterclaim interposed by defendant Syndicate;
(5) dismissing the first counterclaim interposed by defendant Club, except as to paragraph (a) 1 of its demand for judgment, as to which declaratory judgment will be granted as herein-before in paragraph (1) indicated, and except as to paragraph (a) 2 of its demand for judgment, as to which it may have judgment declaring that it possesses exclusive hunting, fishing and boating rights within the areas hereinbefore indicated, which do not include so-called Van Etten lot or the so-called Boyce lot, and the judgment, so far as against defendant Club, may provide that the relief demanded in paragraph (a) 3 of its demand for judgment is denied as unnecessary;
*1037 (6) dismissing the second counterclaim interposed by defendant Club upon the ground that the record demonstrates no invasion or threat of invasion of the defendant Club’s rights nor any other basis for the granting of injunctive relief at this time; and
(7) awarding costs to plaintiff Council as against defendant Syndicate only (see CPLR 8101, 8302).
In the event the parties shall find it mutually advantageous to enter into an interim agreement respecting the mechanics of the maintenance and repair of the dam and the maintenance of the water level, pending appeal, subject, of course, to modification or rescission of any such agreement upon reversal or modification of the judgment to be entered upon this decision, application to enter such agreement at the foot of the judgment will be entertained.

. In Loch Sheldrake Assoc. v. Evans (306 N. Y. 297, 303, 304), however, water piped from a lake to distant, unrelated lands and there consumed for hotel purposes was said to be “ produce from the land ”.

. Certain additional reservations, which do not bear directly upon the problem, were as follows: “ Also reserving to the said party of the first part their successors or assigns, the right at all times hereafter freely and without charge to have take and use from the land or premises hereby conveyed to the parties of the second part, all the stone earth brush or other material of every kind whatsoever requisite or convenient for constructing improving repairing altering enlarging or maintaining the said reservoir and its appendages and the works incident to or connected therewith with the right also at any and at all times forever of free ingress egress and regress, do and for the said party of the first part their successors or assigns, by themselves their engineers agents or workmen, with their beasts of draught or burthen and implements of labor any or every of them upon through or from the land hereby conveyed to the said party of the second part, as fully and as absolutely in regard to all the exceptions and reservations herein made as if this agreement had never been executed and without any obligation on the part of the said party of the first part their successors or assigns to erect or maintain any bridge or fence on the premises hereby conveyed.”

. The deed was to Alhtaha Council, Inc., Boy Scouts of America (as the plaintiff herein was originally named), now Passaic Valley Council, Boy Scouts of America, pursuant to certificate of combination filed under the New Jersey Statutes.

. By section 6 of the act, the Canal Company’s corporate name was changed from “ The president, managers and company of the Delaware and (Hudson Canal Company ” to “ The Delaware and Hudson Company ” (hereafter D & H).

. Except as the Syndicate contends that the bounds of the so-called Royce lot, claimed by it, extend beyond the shore line and into the pond. The question will not be considered, inasmuch as- an action to determine title is now pending in Orange County. However, the Syndicate’s contention — denying the Council’s right to flood the bed of the reservoir to which the Syndicate claims title, at the site of the Royce lot — is likewise presented by the Club with respect to the entire bed of the reservoir, owned by it in fee, south of the county and property line, and will be dealt with.

. The Syndicate, in its brief, concedes the “ abandonment of the canal ” prior to the 1903 deed to the Club, and elsewhere in its brief cites an historical work for the statements that the last eanalboat trip from Honesdale to Rondout was made in 1898 but that 35 miles of the lower end of the canal were operated in 1899.

. The Council does assert that if any title passed under the deed to Cornell, it ultimately devolved upon the Council by quitclaim deed to it, executed by O. & W. Lines, Inc. on August 10, 1971.

. Noted above (supra, p. 1021) is the contrary view — that flowing water “is not considered a product of the soil [and] a right to take such water is not a right of profit a prendre, but rather is an easement ” (25 Am. Jur. 2d, Easements and Licenses, §4, pp. 420-421; 17 N. Y. Jur., Easements and Licenses, § 4).

. Consistently enough, the witness testified that he had on one occasion sought and obtained permission from Mr. Galligan to moor a boat to the dock atop the dam, although the Syndicate now claims exclusive rights to the dam, which, of course, controls the water level.

. The limited effect necessarily given the proof and the concessions of ownership is reflected by the findings upon defendant Syndicate’s requests to find.